[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-14128
Non-Argument Calendar
_____

D.C. Docket No. 8:17-cr-00511-SCB-AEP-3

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

RASHICA SHAGUANA FORD,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(September 24, 2019)

Before MARTIN, JORDAN, and BRANCH, Circuit Judges.

PER CURIAM:

Rashica Ford is a federal prisoner currently serving a 110-month sentence

for conspiracy to commit arson in violation of 18 U.S.C. § 844(i) and (n).  On

appeal, she raises several challenges to her conviction and sentence.  After careful

consideration, we vacate her conviction and sentence and remand for a new trial.

**I.**

On the evening of March 11, 2015, the Bradenton Police Department

received a call about a fire.  The department dispatched several officers to the

scene, who spoke with the owner of the building, Angie Phillips.  The officers then

put out an alert for a red, four-door Volvo that was seen leaving the building

shortly after the fire started.

As it turned out, the red Volvo belonged to Ford, although she was not

driving it on the night in question.  Instead, police officers found her half-brother,

Herbert Pinckney, and her boyfriend, Jodarin Whitfield, behind the wheel when the

officers tried to stop the car.  Although Pinckney and Whitfield initially stopped

when they saw the officers, they then sped up and tried to flee.  The ensuing car

chase ended after Pinckney and Whitfield crashed into a house.  Pinckney, who

was injured, stayed inside the car.  Whitfield, who was unharmed, tried to escape

by foot.  A search of the vehicle followed, which turned up a gas can, a gallon jug

that had a faint small of gasoline, and two lighters.  Both Pinckney and Whitfield

were eventually arrested and taken into custody.  Ford was later arrested as well.

The government indicted Pinckney, Whitfield, and Ford each on one count

of arson and one count of conspiracy to commit arson, in violation of 18 U.S.C.

2

§ 844(i) and (n).  Ford elected to go to trial.  Pinckney and Whitfield pleaded guilty to the conspiracy charge and agreed to testify at Ford's trial.

At trial, Pinckney testified that Ford used to live in the building Phillips owned.  Pinckney said he and Whitfield set fire to Phillips's house because of a disagreement between Ford and Phillips over rent.  As he understood it, Phillips evicted Ford and would not let her back on the property to retrieve her furniture.  Pinckney testified that this angered his half-sister and that she asked him if he would be willing to drive himself and Whitfield to "take care of" Phillips.  Pinckney agreed and borrowed Ford's Volvo to drive to Phillips's house with Whitfield.  On the way, they stopped at Whitfield's relative's house, where they gathered containers.  They then went on to two gas stations, where Whitfield filled a container with gas and Pinckney purchased a lighter.  According to Pinckney, once they got to Phillips's house, Whitfield left the car, grabbed some stuff from the back seat, and then started "crouching" down and "fumbling with something" by the building.  Pinckney testified that he saw flames appear shortly after.  Whitfield testified similarly, adding that Ford told him she "wanted [them] . . to go set [Phillips's] house on fire.

The government also called Ford's sister, Tearia Eddins, to testify.  Eddins made statements to investigators in 2016 about the fire at Philips's house and, in preparing her to testify at trial, the government played the recording of these

3

statements for her.  Before trial, however, Eddins underwent brain surgery to treat her seizures.  As a result, she could no longer recall what she said to investigators in 2016.  Eddins testified she could not remember "the whole conversation" she had with the investigators and all she could remember about the arson itself was that Phillips's house "got caught on fire."  She additionally testified she could not remember any conversations about Ford being involved in the fire, but she could remember some conversations about Whitfield's involvement.  Following this testimony, the government sought permission from the district court to introduce a recording of Eddins's 2016 statements to the investigators as a recorded recollection under Federal Rule of Evidence 803(5).

In response to the government's motion, the district court permitted defense counsel to ask Eddins several questions outside the presence of the jury to ascertain whether the recording was admissible under Rule 803(5).  Among other things, counsel asked Eddins whether, having listened to the recorded statement, she felt "it accurately represent[ed] the knowledge that [she] had on that particular day." Eddins replied that she "really d[id]n't know" because she couldn't remember and she had no idea if the information contained in the statement was true at the time. Based on Eddins's answers, defense counsel argued the recording could not be played under Rule 803(5) because Eddins was unable "to say that the record accurately represented her knowledge and recollection at the time."

4

The district court did not immediately rule on counsel's objection, choosing instead to have the government play portions of the tape outside of the jury's presence to see if Eddins could confirm the veracity of each statement she made. Eddins was able to confirm it was her voice on the tape. But, although the recording helped jog some of Eddins's memory, she could not remember Ford telling her about "want[ing] to burn Ms. Phillips'[s] house down." Neither could Eddins remember Ford taking responsibility for sending Whitfield to Phillips's house. Eddins testified that she "didn't even talk to [Ford]" before speaking with the investigators, none of the statements on the tape could be attributed to conversations she had with Ford, and she never observed the fire or anything related to the fire. Instead, Eddins attributed her statements on tape to a conversation she had with her mother, who received the information from Phillips.

The government argued based on Eddins's testimony that because she could attest to the accuracy of some of the statements she made in the audio recording, the entire recording was admissible under Rule 803(5). According to the government, "in the recording [Eddins] state[d] exactly where the source of information is from and it is Ms. Ford." Eddins then emphasized that she could not have received her information from Ford, asking "How is it going to come from her if I didn't talk to her?" Over the defense's objections, the district court agreed

with the government and allowed the recording to be played for the jury. The tape was not admitted into evidence.

Following Eddins' testimony, the government called Special Agent Konstantino Balos to testify about several conversations he had with Ford after the fire. Special Agent Balos testified that Ford changed her story several times about when she first heard about the fire. According to Special Agent Balos, Ford first claimed she didn't hear about the fire until a week later when it was on the news. At a second interview, she said she learned about the fire just a day later. And at a third interview, she said she found out about the fire the same night it happened when she went to pick up Whitfield and he "reeked of gasoline." On cross-examination, Special Agent Balos acknowledged that Pinckney "never mentioned that he ever had a meeting with Ms. Ford about setting th[e] fire" during an initial interview.

The defense called three witnesses: Ford's mother, Evelyn Ford; Ford's daughter, Jaceria Ford; and Ford herself. Jaceria Ford testified that Whitfield told her "he knew he shouldn't have went" to set Phillips's house on fire and that he "messed up." Evelyn Ford testified that Whitfield mentioned after the fire Phillips "shouldn't have cussed him out" and "disrespected him," but Evelyn "d[id]n't know what that was about." Evelyn Ford also testified that on one occasion when Whitfield was upset with her, he "said he was going to burn [her] house down."

Ford, for her part, testified that Whitfield was physically abusive toward her. She explained she loaned her car to Pinckney twice on the night in question, once so he could drive to his girlfriend's place in a nicer car and once so he could get marijuana for himself and Whitfield. She testified she had no idea Pinckney also drove her car to Phillips's place. Ford confirmed she moved out of Phillips's house following a disagreement about rent and Phillips refused to let her pick up her bedroom furniture. However, she also testified Whitfield was the one who got into a verbal altercation with Phillips when they went to retrieve her furniture and Whitfield was upset because Phillips called him a disrespectful slur.

As for the fire, Ford testified she only learned about it after Whitfield and Pinckney crashed her car and she went to pick up Whitfield. According to Ford, Whitfield confessed that he went to Phillips's house to set it on fire because Phillips "disrespected" him. Ford explained she initially lied to officers about what happened because Whitfield insinuated one of her kids would "com[e] up missing" if she "sa[id] anything wrong." She added that she never asked Pinckney and Whitfield to commit arson and if she had known about their plan, she would never have allowed them to take her new car.

During closing arguments, the government emphasized the importance of Eddins's recorded interview with the investigators. In particular, the government said:

> [Eddins] remembered some things from a few years ago with perfect clarity, but she remembered nothing that incriminated her sister, Rashica Ford, when she took the stand today.
>
> But thankfully Special Agent Balos recorded the prior interview that he had with Ms. Eddins that we played before you. In that interview Ms. Eddins said that on the day of the fire Ms. Ford came home with Jodarin Whitfield; that during the conversation that she overheard, the defendant told Mr. Whitfield what to do with regard to Ms. Phillips. She said that the defendant said, "Make sure it goes through the window and burn that bitch's house down."

The jury then retired to deliberate.

The next morning, the jury sent back some questions to the district court. Among other things, the jurors wanted the court to "Please clarify reasonable doubt." The jurors also expressed interest in listening to "the audio clip of Tearia Eddins." Because the audio recording was played pursuant to Rule 803(5) and the defense did not stipulate to the recording's admission, the district court informed the jury that it had "all of the evidence" and did not provide the jurors with a copy of the recording. Three hours later, the jury informed the court that it could not reach a unanimous verdict on either count, conspiracy to commit arson or arson. The court then gave the jury a modified Allen v. United States, 164 U.S. 492, 17 S. Ct. 154 (1896), charge, instructing the jurors to continue deliberating. The jury returned its verdict soon after, finding Ford guilty of conspiracy to commit arson. However, the jury could not reach a unanimous verdict as to the arson count, and the government dismissed the charge without prejudice as a result.

8

The district court sentenced Ford to 110 months of imprisonment, followed by three years of supervised release. Ford was also ordered to pay $647 in restitution. This is her appeal.

## II.

This Court "review[s] application of the Federal Rules of Evidence for abuse of discretion." United States v. Jones, 601 F.3d 1247, 1263 (11th Cir. 2010). "In applying this standard, we will affirm a district court's evidentiary ruling unless the district court has made a clear error of judgment or has applied an incorrect legal standard." Id. (quotation marks omitted). We will not, however, "overturn an evidentiary ruling and order a new trial unless the objecting party has shown a substantial prejudicial effect from the ruling." United States v. Barton, 909 F.3d 1323, 1330–31 (11th Cir. 2018) (quotation marks omitted). If an error "had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted." Id. at 1331 (quotation marks omitted).

## III.

Ford primarily argues that her conviction should be vacated because the district court abused its discretion when it allowed the government to play the

audio recording of Eddins's interview with investigators under Federal Rule of Evidence 803(5).  We agree.[1]

Rule 803(5) provides that a record "may be read into evidence" if it (1) "is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately," (2) "was made or adopted by the witness when the matter was fresh in the witness's memory," and (3) "accurately reflects the witness's knowledge."  Fed. R. Evid. 803(5).  Ford argues the recording should not have been played because Eddins testified she could not attest to the accuracy of her statements in the recording.  In response, the government argues the record was properly played because Eddins's statements on the tape prove their accuracy.

The government's reasoning misapprehends Rule 803(5)'s requirements. "Rule 803(5) . . . requires that the witness verify the contents of the past statement."  Jones, 601 F.3d at 1262.  This means "[t]he witness must be able now to assert that the record accurately represented [her] knowledge and recollection at the time."  Id. (quotation marks omitted and emphasis added).  Rule 803(5)'s accuracy requirement is satisfied as long as the witness can "affirm" that she knew her statements "to be true at the time" she made them.  Id. (quotation marks omitted).  Contrary to the government's understanding, the recorded statement cannot affirm its own accuracy for Rule 803(5) purposes.  See 2 McCormick on

---

[1] We therefore need not address Ford's remaining arguments on hearsay and sentencing.

10

Evid. § 283 (7th ed. 2016) ("[T]he witness must acknowledge <u>at trial</u> the accuracy of the statement.  An assertion of its accuracy in the acknowledgement line of a written statement or such an acknowledgement made previously under oath is not sufficient." (quotation marks omitted, footnote omitted, and emphasis added)).

In this case, Eddins testified that she "really d[id]n't know" if the recorded statement accurately represented the knowledge she had on the day she was interviewed.  She repeated that she "d[id]n't know" if the information she gave in the interview was true at the time.  And although she was eventually able to confirm the accuracy of some statements in the interview, such as the fact that Ford drove a red Volvo at the time of the fire, she could not confirm the accuracy of others.  For instance, she could not confirm the accuracy of her statement that Ford said "she wanted to burn Ms. Phillips'[s] house down" or the statement that Ford "[told] Jodarin to go to Ms. Phillips'[s] house."  Eddins also specifically disavowed the accuracy of her statements in the recording that Ford was the source of her information.  The government itself acknowledged at trial that Eddins could only remember "certain things" were "accurate."

In light of Eddins's testimony, the district court abused its discretion when it permitted the full recording to be played for the jury.  Had the district court played only the statements Eddins could confirm she believed to be accurate at the time she made them, there would be no problem.  Instead, the district court elected to

11

play the full tape, including parts that Eddins specifically said were inaccurate.[2]

This was error, even under our deferential standard of review for evidentiary

rulings. See United States v. Schoenborn, 4 F.3d 1424, 1429 (7th Cir. 1993)

(concluding the district court "abused its discretion in admitting [a] report as a past

recollection recorded under Rule 803(5)" because the witness "subsequently

disavowed [the report's] accuracy on the witness stand").

Neither was the district court's error harmless, as the government argues.

Although Pinckney and Whitfield testified for the government, only Whitfield said

Ford directed him to commit arson. Pinckney, in contrast, testified that Ford asked

him to help "take care" of Phillips, although he made no mention of that

conversation in his first interview with investigators. Beyond that, both men

admitted under their respective plea agreements they needed to cooperate with the

government "as much as possible" to potentially reduce their own sentences.

Without Eddins's recorded statements corroborating Ford's alleged role in the

conspiracy, the jury may very well have attached less significance to the two men's

testimony. Cf. United States v. Schoneberg, 396 F.3d 1036, 1041 (9th Cir. 2005)

(explaining the "government's star witness['s]" "motive to lie . . . arose from a plea

---

[2] We reject Ford's challenge to the district court's decision to supplement the record on appeal with a copy of Eddins's recorded statements to investigators. There is no indication that the audio recording is not what it purports to be, and the district court was well within its rights to supplement the record to make clear what the jury heard. Fed. R. App. P. 10(e).

agreement that left open the possibility that he might walk out the door a free man if the government was satisfied that his testimony was the truth"); United States v. Lindemann, 85 F.3d 1232, 1243 (7th Cir. 1996) ("Lindemann's suggestion that Burns falsely implicated him to obtain a plea deal was certainly an attack on the credibility of Burns'[s] testimony.").

In the end, Eddins's taped statements were the only evidence by an uncharged witness directly tying Ford to the arson conspiracy. It is not unreasonable to think the jury may have considered Eddins's statements the tiebreaker. This is particularly true where, as here, the jury specifically expressed an interest in listening to her taped statements during deliberations and struggled to agree on a verdict as to either charge. See, e.g., United States v. Shavers, 615 F.2d 266, 269 (5th Cir. 1980) (rejecting the government's harmlessness argument in part because "the jury was at one point hopelessly deadlocked on a verdict").[3] In a world where Eddins's recorded statements were not introduced to the jury, the outcome of the trial may well have been different, so we cannot say the introduction was harmless. Because the district court's erroneous evidentiary ruling was not harmless, we vacate Ford's conviction and sentence and remand for a new trial.

---

[3] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. Id. at 1209.

13

**VACATED AND REMANDED.**