[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-13973

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

KENDRICK EUGENE DULDULAO,
MEDARDO QUEG SANTOS,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:17-cr-00420-MSS-AEP-4

_____

Before JORDAN, JILL PRYOR, and TJOFLAT, Circuit Judges.

PER CURIAM:

Kendrick Eugene Duldulao and Medardo Queg Santos, both physicians, served sequentially as Medical Directors of a pain management clinic in Tampa, Florida, called Health and Pain Clinic ("HPC"). HPC liberally dispensed controlled substances to its patients. Duldulao and Santos, along with others involved with HPC, were charged with drug and conspiracy crimes related to their activities at the clinic. A jury convicted Duldulao and Santos; they now appeal the sufficiency of the evidence supporting their conspiracy convictions, and Santos appeals the district court's admittance of expert testimony, as well as his sentence. After careful review, and with the benefit of oral argument, we affirm.

## I.    BACKGROUND[1]

A superseding indictment charged Duldulao and Santos with one count of conspiracy to distribute and dispense oxycodone, hydromorphone, morphine, methadone, and hydrocodone (Schedule II controlled substances) and alprazolam (Xanax, a Schedule IV controlled substance), not for a legitimate medical purpose and not in the usual course of professional practice, in violation of 21 U.S.C. § 846. It also charged both men with sub-

---

[1] Because we write for the parties, we recount only the facts necessary to explain our decision.

stantive counts of distributing controlled substances not for a legitimate medical purpose and not in the usual course of professional practice, in violation of 21 U.S.C. § 841.

Ernest Gonzalez, the de facto owner of HPC, hired Duldulao in 2011 and Santos in 2014 to work at his pill mill. A pill mill is a pain management clinic that does not follow medical standards because its purpose is to prescribe controlled substances regardless of whether its patients have a medical need for them. A hallmark of the pill mill is that procedures to ensure patients received prescriptions only for legitimate medical needs are nonexistent or frequently not followed. To that end, HPC's procedures ensured that patients got into the doctor's office and out with their prescriptions as quickly as possible. Although the clinic was not supposed to dole out controlled substances to patients who were abusing the drugs, its patients exhibited recognizable signs of drug-seeking behavior and drug addiction.

Gonzalez knew that the patients "were coming in [] to get controlled substances," so, at Duldulao's and Santos's respective job interviews, Gonzalez made it clear that HPC's patients expected to receive controlled substances during their visits. Doc. 382 at 38.[2] Gonzalez confirmed that Duldalao knew the clinic was "needing a doctor who was going to do controlled substances" and discussed specific controlled substances that Duldulao would

---

[2] "Doc." numbers are the district court's docket entries.

use to treat the clinic's patients. Doc. 382 at 36. Gonzalez also told Duldulao and Santos about key aspects of the business model: very short, timed patient appointments, high patient volume (30–40 patients per day), and cash only—no insurance payments.

Aside from what Duldulao and Santos were told during their interviews, characteristics of the clinic suggested that it was not a legitimate medical operation. For example, the clinic had barely any medical equipment—only an exam table for the patients to sit on—or supplies.

As another example, the HPC staff who ran the front desk and did patient intake had no medical or administrative training. Yet they wrote prescriptions for controlled substances for the doctor to sign after each patient's brief visit. Their other duties included collecting cash payments from patients and knocking on the doctor's door to indicate that the ten-minute appointment should end.

What is more, many of the patients appeared to be drug abusers. Witnesses described them as having bloodshot eyes, slurring their words, looking sleepy, and stumbling when they walked. Some of them had visible track marks, indicating intravenous drug abuse. Others looked like they were going through opiate withdrawal—sweating, shaking, vomiting, and experiencing hot and cold flashes. People were "nodding out" in the waiting room and "shooting up" in the parking lot. Doc. 384 at 100; Doc. 387 at 42. Patients hung out in the parking lot and left be-

hind trash like baggies, blunt wrappers, and syringes. Appearances aside, as many as one in five patients tested positive for illegal drugs during their drug tests at HPC. The clinic administered drug tests to pass state inspections, but patients sometimes bribed HPC staff to skip the drug test. The staff falsified test records after letting patients skip the test.

Nevertheless, according to witnesses, HPC patients always left with new prescriptions for controlled substances. To obtain prescription medication, HPC patients did not need much documentation of a condition that required pain management—just an MRI within the last two years documenting a physical abnormality of some kind. That and a Florida driver's license got the patients prescriptions for controlled substances like oxycodone and methadone.

Furthermore, both defendants' own practices failed to comport with usual professional practice. During patient appointments, Duldulao conducted cursory medical examinations. Sometimes he spent up to five minutes on the physical exam; sometimes he simply did not perform one. He spent little time on patient medical history. When he went on vacation, his patients picked up prewritten, postdated prescriptions without any medical exam at all. He wrote prescriptions for controlled substances for patients even when they bore visible track marks or had traveled from long distances—both red flags for controlled substance abuse, according to the government's medical expert witness, Dr.

Kevin Chaitoff. Duldulao prescribed controlled substances in dangerous combinations, allowing his patients to mix Xanax, methadone, and a muscle relaxer called Soma. He even admitted to his girlfriend that he worked at a "pain mill." Doc. 386 at 143.

When Santos replaced Duldulao as HPC's Medical Director, little changed at HPC. Like Duldulao had, Santos prescribed controlled substances to people who looked like drug abusers. He saw them in brief appointments, timed by HPC staff. It did not matter if his patient's medical history or drug test was missing. It did not matter if a patient told him she shared her pills with friends or family. He prescribed patients controlled substances nonetheless. He prescribed drugs in the same dangerous combinations that Duldulao had. Santos, too, went on vacations but left prewritten, postdated prescriptions for his patients.

Unbeknownst to Santos, however, two of his patients were government agents: undercover DEA task force member Kathy Chin and her "boyfriend," confidential informant Robert Vasilas. Santos's unlawful interactions with them led to his three substantive convictions for unlawful distribution. Santos's first substantive conviction for distribution and dispensing arose out of the first time Chin and Vasilas saw Santos together. Vasilas, a returning patient, told Santos that Chin was "robbing" him of his pills when she ran out of hers. Doc. 386 at 173. Instead of investigating this red flag, Santos gave them prescriptions for greater quantities of oxycodone. He also wrote Vasilas a new prescription for Xanax

without asking him about his history with anxiety or what tools he used to manage it. He started Vasilas on Xanax, when most doctors would not have prescribed that drug to someone who was also taking an opioid. At no point did Santos discuss alternative treatments or milder medications with either patient.

Santos's second substantive conviction stemmed from a visit Chin made to HPC without Vasilas. In an earlier visit, Santos had agreed to give Chin prescriptions to take to Vasilas, who said he was going to be out for town for work. Santos told Chin she would have to pay for a visit for Vasilas, even though Vasilas would not actually be present. Santos gave her prescriptions for the absent Vasilas, even filling out Vasilas's file as though he had examined him.

The third substantive conviction concerned a return visit by Chin and Vasilas. Vasilas told Santos that he had run out of his pills and had been getting medications from friends and family. Santos responded by giving Vasilas extra prescriptions with a "do not fill until" date; Santos charged him for the prewritten prescriptions. After collecting evidence through these undercover visits, the government indicted Santos, Duldulao, and Gonzalez. Gonzalez pled guilty and testified against Santos and Duldulao.

At trial, the government established the above facts through the testimony of Gonzalez, government agents, HPC patients, and HPC employees. The government also called Dr. Chaitoff, an expert in pain management treatment, to testify

about how he practices pain management. Dr. Chaitoff testified that in his practice he conducts a comprehensive physical exam on patients; speaks with them about their medical history, their current pain, and the narcotics agreement patients are required by law to sign; and typically allots 30 to 35 minutes for an initial visit and 20 minutes for a follow-up—much longer than the appointments patients received with Duldulao or Santos. He testified that patients who are clearly abusing controlled substances should not be treated with more controlled substances, even if they have a legitimate pain problem.

Dr. Chaitoff opined that "most of" the prescriptions that Santos wrote for controlled substances "were provided for no legitimate medical purpose, [and] they were not issued in the course of one's professional practice." Doc. 388 at 20. Santos moved to strike his testimony, but the district court denied the motion, noting that Santos could still effectively cross-examine Chaitoff to challenge his credibility.

After the government rested its case, both Duldulao and Santos moved for a judgment of acquittal. At the conclusion of the trial, the district court granted Duldulao's motion as to most of the substantive counts of dispensing and distributing controlled substances but otherwise denied the motions. The jury convicted Duldulao of conspiracy and acquitted him of the one remaining substantive count of dispensing and distributing controlled substances. The jury convicted Santos of conspiracy and three sub-

stantive charges of distribution relating to his treatment of Chin and Vasilas, but it acquitted him of two other charges of distribution. After the jury returned its verdict, Duldulao and Santos renewed their motions for judgment of acquittal the district court denied their motions. The court ultimately sentenced Duldulao to twelve months and one day of imprisonment and Santos to six years of imprisonment.

On appeal, Duldulao and Santos now challenge their convictions, and Santos also challenges his sentence.

## II.    STANDARD OF REVIEW

We review the sufficiency of the evidence *de novo* when, as here, the defendants have preserved their claims by moving for judgments of acquittal. *United States v. Azmat*, 805 F.3d 1018, 1035 (11th Cir. 2015).

We review evidentiary issues that were not raised at trial for plain error, which "occurs if (1) there was error, (2) that was plain, (3) that affected the defendant's substantial rights, and (4) that seriously affected the fairness, integrity, or public reputation of judicial proceedings." *United States v. Wright*, 607 F.3d 708, 715 (11th Cir. 2010) (internal quotation marks omitted). An error is plain if it is "clear" or "obvious." *United States v. Olano*, 507 U.S. 725, 734 (1993). We have explained that "where the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it."

*United States v. Chau*, 426 F.3d 1318, 1322 (11th Cir. 2005) (internal quotation marks omitted).

We review the district court's denial of a motion to strike testimony for an abuse of discretion. *See United States v. Anderson*, 782 F.2d 908, 916 (11th Cir. 1986). We will reverse only if we find an error that affected the defendant's substantial rights. *See United States v. Barton*, 909 F.3d 1323, 1337 (11th Cir. 2018).

We review a district court's application of the Sentencing Guidelines *de novo*. *United States v. Johnson*, 980 F.3d 1364, 1374 (11th Cir. 2020).

## III.    DISCUSSION

Duldulao and Santos challenge their convictions on the ground that there was insufficient evidence that they knowingly agreed to participate in the pill mill conspiracy. Santos challenges his conviction on the additional grounds that the district court made two reversible trial errors. He contends that the court plainly erred in admitting Dr. Chaitoff's testimony about his treatment of patients and that it abused its discretion in denying his motion to strike Dr. Chaitoff's testimony. Santos also appeals his sentence, arguing that the district court should have applied a clear-and-convincing-evidence standard, rather than a preponderance-of-the-evidence standard, to any relevant conduct findings that would increase his offense level. We address each issue in turn.

## A. The Defendants' Challenges to the Sufficiency of the Evidence

Sufficiency of the evidence review requires us to examine "whether the evidence, when viewed in the light most favorable to the government, and accepting reasonable inferences and credibility choices by the fact-finder, would enable the trier of fact to find the defendant guilty beyond a reasonable doubt." *United States v. Monroe*, 866 F.2d 1357, 1365 (11th Cir. 1989). We will affirm a conviction unless there is "no reasonable construction of the evidence" from which the jury could have found the defendant guilty beyond a reasonable doubt. *United States v. Garcia*, 405 F.3d 1260, 1269 (11th Cir. 2005).

To establish conspiracy in violation of 21 U.S.C. § 846, the government must prove beyond a reasonable doubt that "(1) there was an agreement between two or more people to commit a crime (in this case, unlawfully dispensing controlled substances in violation of § 841(a)(1)); (2) the defendant knew about the agreement; and (3) the defendant voluntarily joined the agreement." *Azmat*, 805 F.3d at 1035. An unlawful distribution under § 841(a)(1) occurs in the medical context when "(1) the prescription was not for a legitimate medical purpose or (2) the prescription was not made in the usual course of professional practice." *United States v. Abovyan*, 988 F.3d 1288, 1305 (11th Cir. 2021). "The rule is disjunctive, and a doctor violates the law if he falls short of either requirement." *Id.*

The government does not need direct evidence to prove conspiracy; circumstantial evidence can prove each element. The first element, the existence of an agreement, "may be proved by inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *Azmat*, 805 F.3d at 1035 (internal quotation marks omitted). The second element, knowledge of an agreement, will be satisfied if "the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to him." *Id.* (internal quotation marks omitted). As for the third element, that the defendant voluntarily joined in the agreement, circumstantial evidence can show a defendant participated in a conspiracy "by showing that he committed acts that furthered the purpose of the conspiracy." *United States v. Iriele*, 977 F.3d 1155, 1172 (11th Cir. 2020). Our cases sometimes merge the first two elements and abbreviate the elements of conspiracy as "knowledge" and "participation." *See, e.g., id.* at 1169–73; *Azmat*, 805 F.3d at 1036–37.

Circumstantial evidence of conspiracy includes "red flags" that would have put a reasonable doctor on notice of the illegitimacy of the operation. *See, e.g., Azmat*, 805 F.3d at 1036 ("All of the witnesses with medical backgrounds also testified that there was an abundance of red flags that should have tipped off any doctor that his patients were seeking pills."). Where, as here, the defendant is a doctor who allegedly participated in a pill mill conspiracy, we have looked to evidence of the doctor's interaction

with patients to conclude "that a defendant distributed a prescription without a legitimate medical purpose and outside the usual course of professional practice." *United States v. Joseph*, 709 F.3d 1082, 1104 (11th Cir. 2013). These aspects include inordinately large quantities of controlled substances prescribed, brief or nonexistent physical examinations, failure to review patient history before prescribing medications, issuance of prescriptions to a patient known to be delivering the drugs to others, and a lack of a logical relationship between the drugs prescribed and treatment of the allegedly existing condition. *See id.*; *Azmat*, 805 F.3d at 1036.

There were sufficient red flags in evidence in this case to establish the defendants' knowledge of an unlawful scheme. Combined with the evidence of the defendants' own conduct, there was sufficient evidence that Duldulao and Santos knowingly joined an agreement to unlawfully dispense controlled substances.

1.    Duldulao's Sufficiency Challenge

Duldulao argues that there was insufficient evidence to support the elements of the conspiracy charge and, specifically, that the red-flag evidence was weak. We agree with the district court that there was sufficient evidence for the jury to find that he knowingly joined an agreement to unlawfully dispense controlled substances. The district court relied on the following types of evidence: HPC owner Ernest Gonzalez's testimony that Duldulao

agreed to write narcotics prescriptions; staff and patient testimony about Duldulao's adherence to the plan to write controlled substance prescriptions to the vast majority of the clinic's clientele; staff testimony regarding HPC's operations while Duldulao served as Medical Director; patient testimony that confirmed the clinic's standard operating scheme under Duldulao; and Duldulao's statements to his then-girlfriend Kelly Schleisner about the clinic, including that it was a "pain mill." Doc. 376 at 6–9. This evidence was sufficient to establish that Duldulao knowingly and voluntarily joined an agreement to unlawfully distribute controlled substances.

From this evidence, the jury reasonably could have found that the government proved all three elements of the conspiracy charge. As this Court has in other cases, here we treat the first and second elements, an agreement to commit a crime and knowledge of the agreement, as a single knowledge element. The jury reasonably could have inferred that Duldulao had knowledge of the criminal object of the conspiracy based on Gonzalez's testimony about his interview with Duldulao for the position of Medical Director, HPC staff's testimony about Duldulao's conduct at the clinic, staff and patient testimony about the patients, and Duldulao's statements to Schleisner. For the third element, voluntary participation, the jury reasonably could have concluded from the testimony concerning his conduct and interactions with patients that Duldulao willingly agreed to and did participate in the conspiracy.

First, we turn to the knowledge element. Gonzalez's testimony was evidence that Duldulao knew about the suspicious nature of HPC from the beginning and nevertheless agreed to get involved. During Duldulao's job interview, Gonzalez showed him a file that listed the types of controlled substances HPC had previously prescribed for patients. Gonzalez told Duldulao that patient visits were timed and that it was "expected that he would probably take about ten minutes" for each patient. Doc. 382 at 40–41. To "expedite things," the staff would write out prescriptions before the patient's visit that Duldulao could sign afterwards. *Id.* at 41–42. This is circumstantial evidence of a scheme to get controlled substances into patients' hands as quickly as possible without regard to medical need. This evidence could lead a jury to conclude that Duldulao agreed to join the conspiracy when he agreed to prescribe opiates under those conditions.

In addition to what he knew before accepting his position as Medical Director of HPC, in treating his patients Duldulao would have seen that they exhibited signs of drug addiction, which are red flags for doctors. *See Iriele*, 977 F.3d at 1170; *Azmat*, 805 F.3d at 1036. Witnesses described patients as looking like drug abusers—for example, they were "a little too sleepy," slurred their speech, had bloodshot eyes or dilated pupils, had visible track marks, smelled of marijuana, and "nodd[ed] out" in the waiting room. Doc. 382 at 92, 96. One employee testified that some patients looked "like they were sleepy and like falling when they would walk." Doc. 382 at 155. Another described the waiting

room as "[s]ometimes chaos" with "people nodding out." Doc. 384 at 100. One witness testified that he was addicted to drugs while he was a patient at HPC and looked like "death warmed over." *Id.* at 257. Nevertheless, he and others like him left Duldulao's office with prescriptions for opiates and other controlled substances.

Beyond the patients' appearances, Duldulao heard from HPC staff that some patients had tested positive for illegal drugs. Staff also told him that some patients traveled long distances to reach the clinic, bypassing other pain management doctors and spending hours in a car despite their supposed chronic pain. Again, our precedent in *Azmat* warns that these red flags suggest the patients were seeking drugs without a legitimate medical purpose. 805 F.3d at 1036. Yet Duldulao prescribed them those drugs. A jury reasonably could infer that he knew the patients were likely drug abusers and knew that he was participating in a conspiracy to unlawfully prescribe them controlled substances.

Other circumstances surrounding Duldulao's presence at HPC are such that a jury reasonably could attribute knowledge of the conspiracy's unlawful character to him. Duldulao knew the clinic's parking lot was covered with trash, including drug paraphernalia, and that the clinic had little medical supplies or equipment. He knew the staff had no training for or experience with working in a medical office, yet they pre-wrote prescriptions for him to sign. He was also aware that HPC did not accept insur-

ance: patients could only pay in cash. The jury could infer that he had "knowledge of the conspiracy due to his presence at" the clinic. *See id.*

Second, the element of active participation in the conspiracy found support in the evidence of Duldulao's conduct and interactions with the patients. Some HPC patients testified that Duldulao did not review their medical history forms and that his physical exams were as brief as two minutes, if they happened at all. *See id.* Duldulao sometimes prescribed combinations of opioids, Xanax, and Soma, drugs "described in the . . . medical literature as the unholy holy trinity for substance abuse." *Iriele*, 977 F.3d at 1170 (internal quotation marks omitted). When he went on vacation, Duldulao signed prewritten and postdated prescriptions and left them with HPC staff so patients could come in to pick them up without a physician present or any medical exam. *See Joseph*, 709 F.3d at 1090–91 ("[E]very 'legitimate doctor' . . . knows that he may not pre-sign prescriptions."). A jury could reasonably infer from this conduct that Duldulao actively participated in the conspiracy.

Duldulao argues that this evidence was insufficient to support his conspiracy conviction. He points out that Gonzalez did not testify to telling Duldulao that HPC was a pill mill, that the job was contingent on Duldulao's agreement to exclusively write prescriptions for controlled substances, or that the patients would not have a medical need for these drugs. And, as Duldulao em-

phasized, Gonzalez testified that, despite his own guilty plea, he was not guilty of conspiracy. testified that he "[n]ever" conspired "with Dr. Duldulao to have him write scripts for no legitimate medical purpose." Doc. 383 at 214. But the jury was free to believe parts of Gonzalez's testimony and disregard others. *See United States v. Takhalov*, 827 F.3d 1307, 1321 n.10 (11th Cir. 2016). Thus, the jury reasonably could have concluded that Duldulao did, in fact, agree to and participate in the conspiracy to unlawfully distribute controlled substances.

Dudulao is correct that the jury heard other countervailing evidence: videos of undercover officers' appointments with Duldulao showed him asking about their medical history and performing a relatively thorough physical exam. In these videos, he asked about their current medications and advised them not to mix the opiates with alcohol. Indeed, Duldulao was acquitted of the substantive charges that were based on these videos. But Duldulao's then-girlfriend Schleisner testified that he told her that he was "pretty sure" some patients were actually undercover officers. Doc. 386 at 132. Construing the evidence in favor of the government, we conclude that a reasonable jury could have found that these recorded exams were anomalies based on Dudulao's suspicions that he was dealing with undercover law enforcement and that most of the time he adhered to the agreement to write prescriptions for controlled substances for no legitimate medical purpose and outside of the usual course of professional practice.

Duldulao also argues that his conspiracy conviction cannot stand because he was acquitted of the underlying substantive charges. Not so. Sometimes a jury renders inconsistent verdicts, but the inconsistency is not a sufficient reason for setting the verdict aside. *See United States v. Powell*, 469 U.S. 57, 64–65 (1984). We have upheld a defendant's conviction when he was found guilty of the conspiracy only and not the underlying substantive offenses. *United States v. Brito*, 721 F.2d 743, 749–50 (11th Cir. 1983) ("[I]nconsistency in a jury's verdict does not require reversal.") (internal quotation marks omitted). "[A]s long as the guilty verdict is supported by sufficient evidence, it must stand, even in the face of an inconsistent verdict on another count." *United States v. Mitchell*, 146 F.3d 1338, 1345 (11th Cir. 1998). Having examined the evidence that supports Duldulao's conspiracy conviction and found it to be sufficient, we reject his challenge and affirm the district court.

2. Santos's Sufficiency Challenge

We agree with the district court that there was sufficient evidence to support the jury's finding that Santos knowingly joined an agreement to unlawfully dispense controlled substances. The district court relied on the following evidence: Gonzalez's testimony, including an implicit admission on cross examination: when asked whether he conspired with Santos, Gonzalez said, "That's what I'm pleading to," Doc. 383 at 224; staff and patient testimony about Santos's conduct and interactions with patients;

staff testimony about HPC's operations while Santos served as Medical Director, which still included brief, timed patient visits, prewritten prescriptions, little to no medical equipment, and no experienced staffers; and patient testimony about their experiences that confirmed that the clinic's standard operating scheme under Santos still featured "high patient volume, long-distance patients, brief medical visits, little to no medical documentation needed to see the doctor, cash payments, no insurance, cursory physical examinations, papered and/or inaccurate patient records, and patients presenting with signs of apparent drug abuse." Doc. 377 at 8.[3] This evidence was sufficient to establish that Santos knowingly and voluntarily joined an agreement to unlawfully distribute controlled substances.

---

[3] The district court also relied on Santos's testimony, in which he admitted that he agreed to write prescriptions for controlled substances at HPC, despite the many indicators that it was not a legitimate operation. The district court erred when it relied on Santos's testimony. When the district court reserves ruling on a motion for a judgment of acquittal made after the government's case-in-chief, the district court's analysis of the evidence and our review on appeal is limited to the evidence the government presented. *United States v. Moore*, 504 F.3d 1345, 1346 (11th Cir. 2007). Because Santos moved for a judgment of acquittal at the close of the government's evidence, the district court was obligated to follow this snapshot rule and judge the sufficiency of the evidence based only on the government's case. It was not supposed to consider Santos's testimony at all when it ruled on the Rule 29 motion for acquittal. But this is harmless error; the remaining evidence was sufficient to deny the motion and convict Santos. *See Barton*, 909 F.3d at 1337.

Santos argues that the government failed to prove that he knowingly agreed to write illegal prescriptions. As we noted above, the agreement element of conspiracy merges with the knowledge element, and we treat them as a single knowledge requirement. We agree with the district court that there was sufficient evidence to support the jury's finding that Santos knowingly joined an agreement to unlawfully dispense controlled substances. Gonzalez's testimony shows that Santos knew about the suspicious circumstances at HPC. Santos's tenure at HPC featured the same red flags that support Duldulao's conspiracy conviction. And, unlike Duldulao, Santos was also convicted of substantive violations based on undercover surveillance, demonstrating that he knew about and agreed to participate in the conspiracy to unlawfully distribute controlled substances.

Gonzalez's testimony was evidence that Santos knew he was agreeing to work at a clinic with an unlawful criminal purpose. When Gonzalez interviewed Santos for the Medical Director position, he made it clear that he wanted a doctor who would write controlled substance prescriptions because when "[t]he patients would come in, they wanted their controlled substances." Doc. 383 at 67. Just like he did with Duldulao, Gonzalez showed Santos a file that contained the types of drugs HPC had prescribed. Santos "was okay with all of it except for he didn't like the methadone and the Xanaxes together." *Id.* at 67. Gonzalez notified Santos of the "same format" for timed visits as he had done with Duldulao, and Santos agreed to write prescriptions under

those conditions. *Id.* at 68. Santos's job interview presented circumstantial evidence that he knew about the criminal scheme.

Other circumstantial evidence about HPC supports an inference that Santos knew about and agreed to the conspiracy. This evidence included numerous red flags, which we discussed as to Duldulao and which "all stayed the same" under Santos: the office had minimal medical equipment or supplies; the staff was untrained; patients traveled long distances to the clinic; the parking lot was littered with trash, including syringes; and HPC only accepted cash. Doc. 384 at 117–18. Patients showed signs of drug addiction, including slurred speech, nodding out, and track marks on their arms. Regardless, "they got their medications" from Santos. Doc. 383 at 115. A jury could reasonably conclude from this evidence that Santos knew the nature of the conspiracy and agreed to join it.

The knowledge element also found support in the evidence of Santos's conduct. Santos, like Duldulao, signed and postdated prescriptions when he went on vacations. Patients did not see Santos while he was on vacation, but they came to HPC and picked up their postdated prescriptions. Santos also left blank, presigned prescriptions for HPC staff to issue. His conduct supports an inference that he knew he had agreed to participate in the conspiracy to unlawfully distribute controlled substances.

Further, at one point, Santos came into the clinic "real nervous" and told Gonzalez "that [they] had to start dropping the

medications" to lower doses. Doc. 383 at 125. Gonzalez respond-
ed that patients who had been taking high doses could not simply
decrease their doses overnight; they could suffer a heart attack or
a seizure. Santos began lowering prescription doses anyway, tell-
ing Gonzalez there were new guidelines from the federal gov-
ernment to comply with. In fact, the Drug Enforcement Admin-
istration ("DEA") had recently seized patient records and shut
down a clinic Santos's wife operated. The jury could have inferred
that Santos was worried that the DEA would raid HPC and dis-
cover that he had been prescribing abnormally high doses of con-
trolled substances. *See Azmat*, 805 F.3d at 1028, 1036–37 (uphold-
ing the conviction of a doctor who sometimes decreased patients'
medications for self-serving reasons).

Moreover, Santos was convicted of substantive § 841(a) of-
fenses based on his interactions with purported patients who were
actually government agents. In an undercover video with confi-
dential informant Vasilas, when Santos asked how Vasilas's sup-
ply of narcotics had held up in the months since his last visit, Vasi-
las said, "I know that I'm not supposed to be saying this but I had
to ask friends and family, you know, to help me out." Govern-
ment Ex. 207 (segment 003) at 2:30–2:50.[4] Santos gave him pre-
scriptions anyway—in fact, Santos gave him three months' worth
of prescriptions, made him pay three times as though he was ac-

---

[4] This citation refers to Government Exhibit 213, a video recording of the
appointment, which was admitted into evidence at trial.

tually coming back in for the two follow-ups, and let his girlfriend pick up his prescriptions, even though Vasilas had just admitted to sharing medication. When Chin asked for an increase in her dosage, Vasilas told Santos, "I know we're not supposed to talk about this, doc, but, you know, . . . she runs out because it's not enough for her, so I have to help her out sometimes." *Id.* at 15:30–15:38. These admissions showed that the patients were diverting their medication, a serious red flag that suggested they were abusing drugs. *See Azmat*, 805 F.3d at 1032; *Joseph*, 709 F.3d at 1090. But Santos did not even react; instead he gave his patients the increased quantities they wanted. These substantive convictions show that he participated in the conspiracy and bolster the inference that he knew about its criminal nature.

Santos contends that "patient testimony and resort to red flags cannot mend the evidentiary gap [as to an agreement] because it does not show any agreement between Dr. Santos and Gonzalez." Santos Br. at 54. We disagree. Just as with Duldulao, the jury was entitled to rely on "inferences from the conduct of the alleged participants or from circumstantial evidence of [the] scheme" to find an agreement. *Azmat*, 805 F.3d at 1035 (internal quotation marks omitted). Here, Gonzalez's testimony, the multiple red flags, and Santos's conduct together constitute sufficient evidence that Santos agreed to work at a pill mill and unlawfully distribute controlled substances. A reasonable jury could find from this evidence that Santos agreed to be part of a conspiracy to distribute controlled substances with no legitimate medical pur-

pose and outside the scope of professional practice. We reject his challenge to the sufficiency of the evidence supporting his conspiracy conviction.

## B.    Santos's Challenge to the Government's Expert Testimony

Prescriptions for controlled substances are lawful when they are "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." *Joseph*, 709 F.3d at 1094 (quoting 21 C.F.R. § 1306.04(a)). To convict a doctor for violating 21 U.S.C. § 841(a), the government must prove that she issued prescriptions with no legitimate medical purpose or outside of the usual course of professional practice. *Id.* The government often uses the testimony of a medical expert witness to satisfy its burden. *See, e.g.*, *Azmat*, 805 F.3d at 1036. But expert medical testimony is not necessary for a conviction. *Joseph*, 709 F.3d at 1100. Here, the government called an expert witness, Dr. Chaitoff, who testified about the definitions of "legitimate medical purpose" and "the usual course of professional practice."

For the first time, on appeal, Santos argues that Dr. Chaitoff's testimony violated the rules of evidence in two ways: first, by opining on Santos's subjective mental state, and second, by reaching a legal conclusion. But the district court's decision to admit the testimony was not contrary to binding precedent directly resolving these legal issues. *United States v. Lejarde–Rada*,

319 F.3d 1288, 1291 (11th Cir. 2003). Therefore, we discern no plain error.

A district court may admit expert testimony that "help[s] the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Generally, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). But "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Fed. R. Evid. 704(b). Rule 704 bars a witness from giving legal opinions (e.g., "The defendant broke the law") and from discussing culpable mental states (e.g., "And he did it knowingly"). An expert witness can give his opinion about an ultimate issue so long as he does not tell the jury what result to reach. *See* Fed. R. Evid. 704 advisory committee's note. There is a difference between simply opining on an ultimate issue and impermissibly directing the jury to a result, however. *See United States v. Grzybowicz*, 747 F.3d 1296, 1310 (11th Cir. 2014).

Santos first argues that Dr. Chaitoff violated Federal Rule of Evidence 704(b) by testifying about Santos's subjective mental state. That argument is not supported by the record, though. Dr. Chaitoff testified about Santos's conduct and his professional opinion of that conduct, but he did not speculate about what was going on in Santos's mind. *See United States v. Akwuba*,

7 F.4th 1299, 1317–18 (11th Cir. 2021) (concluding that medical experts' testimony about the defendant's conduct in issuing prescriptions did not impermissibly give opinions regarding her mental state).

Second, Santos cannot show that there was any plain error in admitting Dr. Chaitoff's testimony despite the fact that Dr. Chaitoff's testimony reached the ultimate issue of whether Santos prescribed drugs for no legitimate medical purpose and outside the usual course of professional practice—the standards of medical care that govern the case. To summarize Dr. Chaitoff's testimony, he first gave background testimony about these standards, explaining that he derived their meanings from the DEA manual, state and federal regulations, and his own pain management practice. Giving examples from his experience, he explained the process he follows before prescribing controlled substances: finding out who referred the patient; verifying that the patient has insurance; discussing in detail the patient's pain complaints and medical and social history, touching on whether there is a history of substance abuse; and completing an extensive physical examination. Before starting someone on controlled substances, he discusses the medication's risks and counsels patients about alternative pain management treatments. He emphasized that there is no one-size-fits-all approach to treating a patient's pain.

He also testified about red flags that would warn him that patients might be abusing their medication: patients with no med-

ical records or no referral, those who traveled from long distances, and those who shared their medication or ran out early. These are all examples of patients who would prompt further investigation, according to Dr. Chaitoff. He found red flags when he watched videos of undercover officer Chin and confidential informant Vasilas visiting Santos's office. Santos had been prescribing opiates for Chin for four months. She had missed two months of appointments, which, Dr. Chaitoff testified, would prompt most doctors to ask her how she had been managing the pain without medication and whether she had gone through withdrawal.

Dr. Chaitoff also noted that it is unusual for a doctor to see a couple together and perform a brief physical exam on both of them simultaneously, as Santos did in the video. Reviewing Santos's notes, Dr. Chaitoff testified that there was little documentation about the results of the physical examinations and why the injuries warranted treatment with controlled substances. Strikingly, Vasilas said that Chin had taken some of his medication, clear evidence of diversion that Santos did not follow up on. Instead, he increased her quantity of oxycodone tablets. Dr. Chaitoff gave his opinion about an ultimate issue when he testified that, at that visit, Santos prescribed Chin and Vasilas controlled substances for no legitimate medical purpose and outside the scope of professional practice. Dr. Chaitoff came to the same conclusion about two other visits. Santos was convicted of substantive charges based on those three patient visits.

It was not plain error to admit Dr. Chaitoff's ultimate-issue evidence. Our precedent allows medical experts to testify about the ultimate issue of the appropriate standard of care. In *Azmat*, the government's medical expert testified that the patients exhibited an "abundance of red flags" and concluded that the doctor did not write prescriptions for them for a legitimate medical purpose or in the usual course of professional practice. 805 F.3d at 1036. The defense's medical expert concluded that the doctor "act[ed] appropriately under medical standards," but the jury determined that the government's expert was more credible and convicted the defendant. *Id.* This Court accepted both experts' testimony as properly admitted and affirmed the doctor's conviction. *See id.* at 1042–44, 1049. Just as in *Azmat,* here it was not plain error for the district court to admit Dr. Chaitoff's testimony for the jury's consideration.

## C.    Santos's Challenge to the Denial of His Motion to Strike Expert Testimony

Duldulao and Santos both moved to strike Dr. Chaitoff's testimony because it relied on evidence the district court had excluded regarding Duldulao's other pain clinic, Rehabilitative Health. The district court granted Duldulao's motion because Dr. Chaitoff improperly relied on the excluded evidence to form his ultimate opinion on whether Duldulao prescribed controlled substances for no legitimate medical purpose and outside the usual course of professional practice. By contrast, the court denied Santos's motion because the excluded evidence did not involve him,

so Dr. Chaitoff's opinion about his conduct remained untainted. Moreover, Santos was not prejudiced because he still had an opportunity to effectively cross-examine Dr. Chaitoff and impeach his credibility.

Santos argues that the district court abused its discretion when it denied his motion to strike and allowed Dr. Chaitoff to continue testifying and give his opinion about the propriety of Santos's prescriptions. Although the court deemed Dr. Chaitoff a "less than reliable witness" because of his memory problems and lack of candor, it was within the court's discretion to deny Santos's motion to strike. Doc. 388 at 97. Only one topic was off-limits in Santos's cross-examination: the evidence about Duldulao's other pain clinic that was excluded by the court's *in limine* order. That limit did not substantially affect Santos's right to cross-examine the witness; he could still mitigate any prejudice through thorough cross-examination. *See United States v. Williams*, 865 F.3d 1328, 1341 (11th Cir. 2017).

## D.    Santos's Sentencing Challenge

Lastly, Santos challenges his six-year sentence, contending that the district court used the wrong standard of proof to calculate the total drug quantity that determined his base offense level. The government bears the burden of establishing drug quantity for the purpose of the Sentencing Guidelines by a preponderance of evidence. *United States v. Rodriguez*, 398 F.3d 1291, 1296 (11th Cir. 2005). The preponderance standard also applies to acquitted

conduct; it satisfies due process in both situations. *United States v. Siegelman*, 786 F.3d 1322, 1332 n.12 (11th Cir. 2015). Santos argues that the clear-and-convincing-evidence standard should apply here because including his acquitted conduct dramatically increased his sentence. We reject his argument.

The government and Santos initially agreed that Santos's sentence should be based on the total drug quantity from his controlled substance prescriptions in all 86 of the patient files that were admitted at trial, assigning him a base offense level of 32 under the Sentencing Guidelines. Later, Santos objected and asked the district court to calculate the drug quantity based only on the prescriptions that the jury had found to be unlawful beyond a reasonable doubt, which would lower his base offense level to 24. He argued that his partial acquittal meant the court should not generalize from his three convictions to all 86 patient files. The court disagreed, finding the drug quantity by a preponderance of the evidence. It calculated that Santos had a base offense level of 32 and added a two-level enhancement for abusing his position of trust. On appeal, Santos maintains that the higher standard of proof should apply.

His argument is foreclosed by precedent. This Court has consistently held that district courts are required to make factual findings for sentencing purposes by a preponderance of the evidence. *United States v. Aguilar–Ibarra*, 740 F.3d 587, 592 (11th Cir. 2014). It thus was not error for the district court to determine

Santos's total drug quantity using a preponderance of the evidence standard.

## IV.    CONCLUSION

For the foregoing reasons, we affirm the district court on all issues.

**AFFIRMED.**