[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

————————————————

No. 22-10433

————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

GILBERTO GONZALEZ-GONZALEZ,

Defendant-Appellant,

————————————————

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:21-cr-00062-002-TFM

————————————————

Before ROSENBAUM and LAGOA, Circuit Judges, and WETHERELL,* District Judge.

WETHERELL, District Judge:

Following a jury trial, Gilberto Gonzalez-Gonzalez was convicted of possession with intent to distribute a controlled substance (cocaine) in violation of 21 U.S.C. § 841(a)(1). Gonzalez's primary argument on appeal is that the evidence was insufficient to support his conviction. He also argues that the trial court erred in admitting certain evidence, excluding other evidence, and instructing the jury on "joint possession." And, finally, Gonzalez contends that the cumulative effect of these errors deprived him of a fair trial.

After a thorough review of the record and with the benefit of oral argument, we affirm Gonzalez's conviction.

## I. BACKGROUND

*A. Facts*

In the early afternoon of January 25, 2021, Baldwin County Sheriff's Office Corporal Jason Kolbe observed a white Ford F-650 flatbed work truck with a sleeper compartment driving northbound on Interstate 65 in Baldwin County, Alabama. The truck had a large wooden crate haphazardly strapped to its bed. The truck slowed down as it approached Kolbe, and it maintained a

---

* Honorable T. Kent Wetherell, II, United States District Judge for the Northern District of Florida, sitting by designation.

slower speed for an unusually long time after it passed by him, rather than speeding back up as most motorists would. After Kolbe pulled out onto the highway to track the truck, he observed it drift over the white line on the righthand side of the road. Accordingly, Kolbe initiated a traffic stop.

Kolbe approached the truck and began to interact with Gonzalez, the driver. The passenger, Daniel Corona, was lying down in the sleeper compartment at the time, and Gonzalez stated that Corona was not a truck driver.

Gonzalez told Kolbe that he and Corona were transporting the crate of broken transmissions from Houston to Atlanta, but Gonzalez was unsure of the exact destination. Kolbe testified that Gonzalez appeared exceedingly nervous—much more so than a typical motorist—and that his nervous demeanor did not abate even after Kolbe assured Gonzalez that he did not intend to write him a ticket.

Kolbe requested paperwork for the load from Gonzalez, and Gonzalez provided a bill of lading that was several months out of date. The bill of lading listed "Edwin Martinez" as the driver and gave an address in Houston as the origin of the trip and an address in Atlanta as the destination. Kolbe's online search of the Atlanta address revealed that it corresponded with a produce store.

Gonzalez also provided Kolbe paperwork related to the truck. The "cab card" Gonzalez produced was for a company called Cheetah Transportation Systems, but the door of the truck

displayed "Pure Power Logistics." Gonzalez was unfamiliar with those companies and the other companies and individuals referenced on other paperwork he provided to Kolbe. The DOT number on the truck's door was associated with Pure Power Logistics, but the insurance card Gonzalez provided to Kolbe was in Cheetah's name and had long since expired. Gonzalez also did not have a logbook, which is typically required of commercial truck drivers and is used to track driving hours and rest breaks.

Kolbe asked Gonzalez to accompany him to his police vehicle. Before doing so, Gonzalez requested—and was granted—permission to perform a safety inspection of his truck. Kolbe testified that in his many years of experience as an officer patrolling the highways, he could not remember ever receiving a similar request from a truck driver.

Gonzalez's purported safety inspection was conducted in a manner atypical of an experienced commercial truck driver and seemed to Kolbe to be designed to "buy time." When conducting the inspection, Gonzalez began by going immediately to the passenger side storage box, but he did not open it, even though that box typically would contain essential safety equipment. Gonzalez hit two of the truck's tires with his hands, rather than a hammer, which Kolbe testified a commercial truck driver would typically use to check tire pressure. Gonzalez also "slapped" the straps holding down the crate on the back of the truck, but he did not check the hooking mechanisms or do anything to actually test the integrity of the straps. As Gonzalez made his way around the truck, he

got back into the cab, where Corona was still located, and remained there for more than a minute.

When Gonzalez finally made his way to Kolbe's police vehicle, Kolbe asked Gonzalez if there were any drugs inside the truck, to which Gonzalez first replied "huh?" and then replied "no" when asked again. Gonzalez then told Kolbe—in contrast with his earlier representation—that Corona was a truck driver. Gonzalez also claimed that he did not own the truck.

Kolbe asked Gonzalez, in English and in Spanish, for consent to search the truck, which Gonzalez gave. Kolbe testified that Gonzalez appeared "apprehensive" and "nervous." When Kolbe opened the crate on the back of the truck, he found an engine block and a transmission, which he described as "broken," "junk," and "not something you would transport from Houston to Atlanta."

When Kolbe asked for the keys to the truck's storage boxes, both Gonzalez and Corona said they didn't have keys. Kolbe found a "scarred up" knife blade wedged between the skirting around the bottom of the truck and the back wall of the sleeper berth. Kolbe testified that the door and locking pin of the passenger side storage box was "extremely tooled," meaning that someone used an item to pry open the locking mechanism. Kolbe suspected that the knife blade was used in this manner to open the storage box.

At this point, Gonzalez requested—and was granted—permission to walk to a nearby line of trees to urinate. While Gonzalez was doing so, Kolbe used a screwdriver to pop open the door

to the passenger side storage box.  Inside, he observed a black duffel bag.  When Kolbe opened the bag, he found sixteen "bricks" of cocaine inside, wrapped in cellophane and covered in grease to mask the smell.  The cocaine weighed a total of 15.86 kilograms.

After discovering the cocaine, Kolbe and his partner detained Gonzalez and Corona.  Kolbe testified that Gonzalez seemed calm and unsurprised, and that Gonzalez complied with his commands without question or confrontation.

Special Agent Matthew Chakwin interviewed Gonzalez after his arrest.  Gonzalez told Chakwin that he was an experienced truck driver and that he owned his own business, Gonzalez Trucking.  Gonzalez further told Chakwin that he was asked by "Neto," a mutual friend of his and Corona's, to drive the truck.  Gonzalez claimed to have had limited-to-no conversations with Corona prior to the trip.  Gonzalez also mentioned to Chakwin that he noticed something wasn't right about the bill of lading.

## B.  Pre-Trial Proceedings

A grand jury indicted Gonzalez and Corona on two counts related to a conspiracy to distribute cocaine.  In Count One, the Indictment charged both defendants with conspiracy to possess with intent to distribute approximately 16 kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846.  In Count Two, the Indictment charged both defendants with possession with intent to distribute approximately 16 kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1).

Corona filed a motion to suppress challenging the traffic stop and search that led to inculpatory physical evidence and statements. The district court permitted Gonzalez to join in that motion, but then denied it on the merits. Following that ruling, Corona entered a guilty plea, which the district court accepted. Gonzalez proceeded to trial.

Before trial, Gonzalez filed a motion in limine seeking to exclude certain communications (particularly images) found on his cell phone. The district court orally denied that motion without much discussion but left open the possibility of Gonzalez objecting to individual pieces of evidence at trial.

## C.  Trial

### 1.  The Government's Case

At trial, the Government presented its case over the course of nearly three days, calling seven witnesses. Kolbe and Chakwin testified as to the circumstances leading up to the discovery of the cocaine as laid out above. The Government also presented evidence from Gonzalez's and Corona's cell phones, as well as evidence pertaining to the drug trade.

The evidentiary rulings challenged by Gonzalez on appeal relate to the cell phone evidence and an exhibit that Gonzalez sought to introduce during his cross-examination of the witness called by the Government to testify about the drug trade. That evidence is summarized below.

### i. Cell Phone Evidence

Gonzalez consented to having his cell phone searched, and forensics experts were able to extract data from both Gonzalez's and Corona's phones. The Government called several witnesses to discuss what was found on the phones.

When the Government sought to introduce evidence from Gonzalez's phone, Gonzalez renewed the argument from his motion in limine that the evidence was not relevant, violated Federal Rule of Evidence 403, and was improper character evidence. The district court ruled that the evidence was admissible as part of the "res gestae" of the case—that is, closely connected to the case—because it was on Gonzalez's phone and that it was up to the jury to determine what weight to ascribe to it.

The cell phone data showed 35 calls between Gonzalez and "Neto" between November 11, 2020, and January 25, 2021.[1] Gonzalez's phone also showed calls (both native and through WhatsApp) in late 2020 and January 2021 to and from someone named Tuckan and to and from Ricardo La Mula. Finally, Gonzalez's phone showed four incoming calls from an unsaved number (identified to be Corona) in the late evening of January 24 and early morning of January 25, 2021. All of these individuals had phone numbers corresponding to the Houston area.

---

[1] This timeframe corresponded to the temporal scope of the conspiracy, as alleged in Count One of the Indictment.

Gonzalez's phone also contained messages (both native and through WhatsApp) between Gonzalez and Tuckan, La Mula, "Rene Exxtreme," Ezequiel Rojas, and Julio Cesar Tampaon. Rene Exxtreme and Tampaon had Mexican phone numbers.

The messages between Gonzalez and Rene Exxtreme discuss the formation of "Gonzalez Trucking" and reference deliveries and pickups occurring at an address in Matamoros, Mexico. Messages between Gonzalez and Neto direct Gonzalez to "make arrangements" with Rene Exxtreme, give an address in Matamoros, Mexico, and state "they will take you the things later if you are going to be there." Several of the calls between Rene Exxtreme and Neto and Gonzalez occurred during these text conversations. In one of these exchanges, Tuckan stated "they owe me two thousand by tomorrow," Gonzalez referenced "expensive" "kilos," and Tuckan commented that they had become even more expensive because of the COVID-19 pandemic. Gonzalez replied, "I know dude they are at 37 38 [thousand dollars]."

Some of these messages contained images (both memes[2] and actual pictures) that appeared to depict or reference cocaine and were sent or received by Gonzalez between March 2019 and

---

[2] A "meme" is "an amusing or interesting item (such as a captioned picture or video) or genre of items that is spread widely online especially through social media." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/meme.

January 2021.  Gonzalez's phone also contained ostensibly legitimate images pertaining to his trucking business.

The Government also introduced evidence from Corona's phone.  In addition to his calls to Gonzalez, Corona's phone showed numerous chats and calls between himself and "La Nanita" and "Edwin M."  Messages between Corona and Edwin M. discuss "meet[ing] up" and "do[ing] the run," and reference travel to the border.  Messages between Corona and Neto from the day before the traffic stop show that Neto put Corona in contact with Gonzalez for the purpose of making the trip from Houston to Atlanta.

Corona's phone showed calls between himself and Neto on the morning of the traffic stop, and calls and messages between himself and Edwin M. while the truck was on the road.  Corona's phone also contained sent images of currency, a black duffel bag, a panel on the side of a truck matching the truck stopped by Kolbe, as well as a news article link discussing cocaine seized during a traffic stop.  Corona sent the images of bulk currency and a duffel bag to Neto on the same day that Neto was supposed to pick up legitimate items related to Gonzalez Trucking from Rene Exxtreme.

### ii.  Testimony of David Noe

The Government called David Noe, a veteran law enforcement officer with extensive training and experience working with drug trafficking organizations, specifically Mexican cartels transporting cocaine.  Without objection, Noe was designated as an expert in drug-trafficking organizations.

Noe testified that the price of cocaine increased because of the COVID-19 pandemic.  According to Noe, one kilogram of cocaine was worth $37,000 or more wholesale, but could be diluted with other substances such that what began as one kilogram of cocaine could be worth up to $400,000 on the street.  Noe opined that the cocaine seized in this case was intended for distribution, and that it had been wrapped in such a way as to conceal the odor and to avoid fingerprints.

Noe testified that Atlanta is a "hub city" for drug trafficking, meaning a location to which drugs are transported from the southwest border to be distributed to customers in the United States.  He testified that Houston to Atlanta (through Mobile) is a roughly 800 mile and 11-to-12-hour drive and is a common drug trafficking route.  Noe testified that Matamoros, Mexico, is across the border from Brownsville, Texas, and is a common location for cocaine to cross into the U.S. from Mexico.

Noe further testified that drug shipments often utilize tractor-trailers or "transportation-type vehicles" with "cover loads" to disguise the fact that they're hauling contraband.  Drugs are often stored in hidden compartments within the truck.  Noe opined that the crate on Gonzalez's truck was a cover load because transmission and engine parts are often used as cover loads and it would usually cost more to send them away for repairs than it would to buy new ones.

Noe further testified that individuals hauling contraband tend to drive the speed limit, unlike most other motorists on the

interstates, in an effort to avoid being pulled over and discovered. And when they do get pulled over, drug traffickers tend to be over-cooperative with the officer.

Noe testified that couriers, referred to as "mules," often provide transportation, but typically are not involved in selling the drugs. Rather, couriers are typically people within the driving business who have a reason to go to the destination city. Couriers are typically paid in cash upon completion of their trip, and instead of making several hundred dollars for a trip from Houston to Atlanta, they could be paid $10,000 or more for the trip.

Noe testified that couriers typically know that drugs are in the vehicle, and that "blind mules" are only seen through courier agencies (e.g., UPS or FedEx) delivering packages via unwitting delivery drivers. Noe explained that drug traffickers typically do not use unknowing or unaffiliated people to transport drugs because that increases the likelihood of getting caught and/or losing the drugs. Noe testified that he had never encountered drug traffickers using a truck driver as a blind mule during his thirty-plus years of experience.

According to Noe, while transporting drugs, couriers typically communicate with the drug trafficking organizations via telephone, and have increasingly moved to "coded and blocked" applications (such as WhatsApp) in an attempt to avoid detection. Noe opined that the calls and messages in this case were consistent with the communications of a drug trafficking group.

On cross-examination of Noe, in support of the defense theory that Gonzalez was an unwitting blind mule, defense counsel attempted to introduce what the parties refer to as the "blind mule letter"—a 2011 letter written by an Assistant U.S. Attorney in the Western District of Texas, which described an instance in which drug traffickers utilized individuals in their personal vehicles with access to commuter lanes to carry drugs[3] into the United States by placing duffel bags into the vehicles' trunks.  The Government objected on hearsay grounds, and the district court ruled:  "I don't think right now you can introduce [the letter itself] because I don't think you can do that extrinsic on cross ….  I'll let you ask him questions about it.  I'm not going to let you offer it."

Consistent with that ruling, the district court permitted defense counsel to show the letter to Noe and to question him about it.  Noe ultimately admitted that it was possible that drug traffickers could use individual drivers who were not commercial package carriers as blind mules.  The district court did not permit defense counsel to admit the letter into evidence or publish it to the jury, and the district court also prohibited references to the letter in closing arguments.

---

[3] The letter specifically pertained to one instance in which drug traffickers had placed a bag containing marijuana, not cocaine, in an unknowing individual's vehicle.

### 2.  Defendant's Motion for Judgment of Acquittal

At the conclusion of the Government's case, Gonzalez moved for a judgment of acquittal, arguing that the Government failed to establish Gonzalez's knowledge of the drugs that were hidden in the truck and that mere presence of the drugs in the truck Gonzalez was driving was not sufficient for a conviction.  The district court denied the motion, reasoning that the testimony of Kolbe was alone sufficient to sustain a guilty verdict and that the messages on Gonzalez's phone and the totality of the circumstances combined with Kolbe's testimony provide sufficient evidence for a reasonable jury to convict Gonzalez.

### 3.  Defendant's Case

The defense called two witnesses, Emilia Fuentes and Jose Pena.  Fuentes testified that Gonzalez formerly worked for her husband, where he was honest, responsible, and friendly, and that she helped him set up his trucking business and file his taxes.  Pena testified that he used to work with Gonzalez, that he knew Gonzalez to have a reputation for honesty, integrity, and hard work, and that Gonzalez had never communicated with him about drugs.  Pena also testified that he was an experienced truck driver, and on cross-examination, he testified that he would have been "in big trouble" if he was driving without an accurate bill of lading.  Gonzalez did not testify.

### 4. Closing Arguments

In closing arguments, the Government argued that the evidence—including Gonzalez's evasive driving, nervous behavior, inconsistent statements, inaccurate or missing paperwork, an illogical load, an unusual roadside inspection, distancing himself from the truck while it was searched, the large quantity of cocaine found in the truck, the lack of surprise when the cocaine was found and he was arrested, and the communications found on his cell phone—showed that Gonzalez's knowledge and intent were that of a knowing drug courier. The defense played a portion of the dash cam video of the traffic stop and argued that driving alone was not enough to convict Gonzalez and that he was merely an unknowing blind mule set up by Corona and their mutual contacts to help them by driving their truck to Atlanta.

### 5. Jury Instructions

The district court instructed the jury that "[t]he defendant can be found guilty of [possession with intent to distribute] only if all of the following facts are proven beyond a reasonable doubt: first, that the defendant knowingly possessed cocaine and, secondly, that the defendant intended to distribute the cocaine."

The court instructed the jury on the different types of possession (actual, constructive, sole, and joint), and with respect to "joint possession," the court stated that: "Joint possession of a thing occurs if two or more people share possession of it. So if my wife and I are driving in my car, we both are in joint possession of

the car."  The second sentence was not a part of the written jury instructions agreed upon by the parties, and it followed a series of other examples involving a car and car keys that the district court provided with the instructions on the other types of possession.

The district court also instructed the jury that it "must find beyond a reasonable doubt the defendant was a willful participant and not merely a knowing spectator" and that the jury "may find that a defendant knew about the possession of a controlled substance if you determine beyond a reasonable doubt that the defendant actually knew about the controlled substance or had every reason to know but deliberately closed their eyes."  And the district court "emphasize[d] that negligence, carelessness, or foolishness is not enough to prove that a defendant knew about the possession of a controlled substance."

Gonzalez did not object to the district court's "impromptu" joint possession example, nor did he ask for a curative supplemental instruction.  In fact, after the district court finished instructing the jury and asked the attorneys for both sides (at side bar) whether they were "satisfied with the instructions," defense counsel responded in the affirmative.

6.  Verdict

The jury found Gonzalez not guilty of Count One (conspiracy) and guilty of Count Two (possession with intent to distribute). The jury made a specific drug quantity finding as to Count Two that is not relevant to the issues on appeal.

## D. *Defendant's Post-Verdict Motion*

Gonzalez renewed his motion for judgment of acquittal or for a new trial on Count Two, arguing that there was insufficient evidence to support the guilty verdict. He also argued that introduction of communications from his cell phone was improper character evidence; that the district court's refusal to give a Rule 404(b) limiting instruction was error; that the joint possession jury instruction was erroneous because it misled the jury to believe if it found Gonzalez possessed the truck then he also possessed the drugs; and that district court's failure to admit the "blind mule" letter violated his right to a fair trial. The district court orally denied the motion, relying on its prior rulings on each of these issues, and further explaining:

> I believe the jury concluded that Mr. Gonzalez-Gonzalez's involvement was on this occasion, and I believe that they saw him as being involved in this transaction and it had not been established to their satisfaction that he had involved himself in other transactions. And so I find what they ruled was consistent. True, they could have said his involvement, his knowing involvement with his codefendant, would be a basis to establish the conspiracy. But laypeople sometimes miss the finer points of law.

## E. *Sentencing and Appeal*

The district court sentenced Gonzalez to 121 months' imprisonment, which was the low end of the guideline range and one

month above the mandatory minimum. After the district court entered judgment, Gonzalez timely filed his notice of appeal.

## II. STANDARDS OF REVIEW

We review the district court's evidentiary rulings under the deferential abuse of discretion standard. *See United States v. Maurya*, 25 F.4th 829, 838 (11th Cir. 2022). We review unpreserved claims of error in the district court's jury instructions for plain error. *See United States v. Merrill*, 513 F.3d 1293, 1305 (11th Cir. 2008) *abrogated on other grounds by Ruan v. United States*, 142 S. Ct. 2370 (2022). We review the sufficiency of the evidence and the denial of a motion for judgment of acquittal *de novo. See Maurya*, 25 F.4th at 841.

## III. ANALYSIS

We will begin our analysis with Gonzalez's challenges to the district court's evidentiary rulings because the resolution of those issues may impact (or moot) his primary issue on appeal—the sufficiency of the evidence. Next, we will consider Gonzalez's challenge to the joint possession jury instruction. Then, we will consider Gonzalez's argument that the evidence is insufficient to support his conviction. Finally, we will consider Gonzalez's claim of cumulative error.

### A. Evidentiary Rulings

Gonzalez challenges two evidentiary rulings: the exclusion of the blind mule letter and the admission of certain evidence from

his cell phone. Each will be discussed in turn, after a brief summary of the applicable abuse of discretion standard of review.

The abuse of discretion standard affords "considerable leeway" to the district court in making evidentiary rulings, and we will only reverse a district court's evidentiary ruling when the ruling is "manifestly erroneous." *See United States v. Barton*, 909 F.3d 1323, 1330 (11th Cir. 2018). Thus, regardless of whether we would have made a different decision in the first instance, "the abuse of discretion standard allows a range of choice for the district court, so long as that choice does not constitute a clear error of judgment." *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (cleaned up). Put differently, we "must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard." *Barton*, 909 F.3d at 1330 (quoting *Frazier*, 387 F.3d at 1259). "However, basing an evidentiary ruling on an erroneous view of the law constitutes an abuse of discretion per se." *United States v. Henderson*, 409 F.3d 1293, 1297 (11th Cir. 2005).

Further, we may affirm on any ground that finds support in the record and the law, *United States v. Campbell*, 26 F.4th 860, 879 (11th Cir. 2022) (en banc), and we will not reverse a decision of the district court if an error committed below was harmless, *see Barton*, 909 F.3d at 1337. In other words, we will only require a new trial if the district court's decision caused "substantial prejudice" to the affected party, and we will not reverse if the error did

not have a substantial effect on the verdict. *See Peat, Inc. v. Vanguard Rsch., Inc.*, 378 F.3d 1154, 1162 (11th Cir. 2004).

### 1. Blind mule letter

Gonzalez contends that the district court abused its discretion by excluding the "blind mule" letter, arguing that the letter was self-authenticating, that it was proper rebuttal evidence which directly addressed the defense's theory of the case, and that it was relevant, probative, and admissible under the Federal Rules of Evidence. Gonzalez further argues that exclusion of the letter impaired his constitutional right to present a complete defense.

We find no abuse of discretion in the district court's decision to exclude the blind mule letter for two reasons.

First, the letter was not properly authenticated. Federal Rule of Evidence 901 requires that the proponent of an item of evidence "produce evidence sufficient to support a finding that the item is what the proponent claims it is." FED. R. EVID. 901(a). For instance, a witness with firsthand knowledge can authenticate an item. FED. R. EVID. 901(b)(1). Other documents are "self-authenticating," so they do not require extrinsic evidence of authenticity to be admitted. FED. R. EVID. 902. For example, documents that have (a) a seal "purporting to be" that of a governmental unit and (b) a signature attesting to the seal are self-authenticating. FED. R. EVID. 902(1)(A)–(B).

Here, Noe did not prepare the letter and was unfamiliar with it, so he was not in a position to authenticate the letter. *See* FED.

22-10433                Opinion of the Court                21

R. Evid. 901(b)(1). Moreover, the letter was not self-authenticating simply because it was on letterhead bearing an image of the logo of the U.S. Attorney for the Western District of Texas since the letterhead is not a "seal" within the meaning of Rule 902(1), *cf. United States v. Hampton*, 464 F.3d 687, 689 (7th Cir. 2006) ("[S]eals are used to attest the authenticity of the document on which the seal is stamped, and no seal was stamped on the copies. The copies were copies of sealed documents rather than sealed documents themselves. The rationale of Rule 902(1) … is that a seal is difficult to forge. But that is not true of a copy of a seal."),[4] and the seal was not attested to in the letter or otherwise certified by a custodian of records, *cf. United States v. Weiland*, 420 F.3d 1062, 1073 (9th Cir. 2005) ("[T]he records were certified as correct by Greene, who also stated that he was the legal custodian of the records and that he had compared the certified copies to their originals.").

---

[4] Even though the Seventh Circuit in *Hampton* ultimately affirmed the admission of the documents at issue in that case under Fed. R. Evid. 1003 (permitting duplicates), it did so because the original documents were stamped with a seal and employees of the banks at issue "testified that they recognized the copies shown them by the prosecutor as copies of the certificates possessed by or posted in their banks." 464 F.3d at 689–90. Here, there is no indication that the original blind mule letter was stamped with a seal attesting to its authenticity, and Noe (who did not write the letter, had no knowledge of the case to which the letter referred, and had never seen the letter before) was not in the same position as the bank employees in *Hampton* to be able to testify knowledgeably as to the letter's authenticity.

Second, as the district court ruled, a party may not introduce extrinsic evidence on a collateral matter when attempting to impeach a witness. *See United States v. Adams*, 799 F.2d 665, 671 (11th Cir. 1986); *United States v. Russell*, 717 F.2d 518, 520 (11th Cir. 1983). The letter was collateral because it went to the issue of whether drug cartels had used blind mules to smuggle marijuana across the United States-Mexican border. Noe said he was unaware of drug cartels using blind mules; the letter said drug cartels had used blind mules (at least as to marijuana-smuggling over the border). But that issue is collateral to Gonzalez's defense—whether *Gonzalez* knew that there was *cocaine* in the truck on his *intra-United States* trip. Thus, although the letter was relevant to Gonzalez's defense insofar as it impeached Noe's testimony that drug cartels didn't use blind mules, the district court did not abuse its discretion by refusing to admit the letter as evidence because the circumstances described in the letter were considerably different from the circumstances of this case.

Moreover, even if the district court had abused its discretion by excluding the letter, the error would have been harmless because the district court allowed defense counsel to impeach Noe by making the point through cross-examination that blind mules may occur in more circumstances than commercial package carriers. Specifically, defense counsel asked Noe, "So having read the letter, would you now agree that there are instances where the cartel may use unwitting mules," and Noe responded, "Again, it is possible that they may use it. Based on reading this letter it is based on

somebody else's opinion. I don't have any further information about that opinion." And Noe agreed (in defense counsel's words) that there "must be some reason for writing [the letter]" because (in Noe's words) "I would believe there is a possibility that they had credible information that this happened. It's a 2011 letter."

Admitting the letter itself into evidence would have had little or no further probative value beyond the facts that were elicited on cross-examination of Noe. Therefore, exclusion of the blind mule letter was harmless and did not deprive Gonzalez of the opportunity to present his defense.

### 2. Evidence from Gonzalez's cell phone

Gonzalez argues that the district court abused its discretion when it admitted certain text messages from his cell phone that were sent or received beginning in 2019 and continuing until days before the traffic stop. We agree in part but find that the error was harmless.

### i. Text messages between Gonzalez and Tuckan

Of the dozens of text messages from Gonzalez's phone that the district court admitted at trial, the only ones specifically challenged on appeal are the November 2020 messages between Gonzalez and Tuckan. In that exchange, which occurred two months before the traffic stop and during period of the conspiracy charged in Count One of the Indictment, Gonzalez and Tuckan discuss "kilos," which Gonzalez stated were "very expensive." Tuckan replied that the increase in price was due to the pandemic, and

Gonzalez said, "I know my dude they are at 37 38." Gonzalez argues that the Government did not introduce any evidence tying this conversation to the charged offenses, and that these communications do not show Gonzalez's knowledge or intent.

We disagree. It is common knowledge (and Kolbe and Noe confirmed) that trafficking quantities of cocaine are typically measured in kilograms, or "kilos," and that cocaine is often trafficked in bricks weighing roughly that amount. Noe further testified that the wholesale price of cocaine in the Atlanta area had risen to more than $37,000 per kilogram during the COVID-19 pandemic. Noe also opined that the messages on Gonzalez's phone concerned drugs and drug trafficking. Thus, these messages are evidence of Gonzalez's familiarity with trafficking quantities of cocaine and the price of a kilogram of cocaine in the Atlanta area, which is relevant to his knowledge in this case. *See United States v. Colston*, 4 F.4th 1179, 1191 (11th Cir. 2021) (text messages discussing prior sale of prescription pills "rebutted the suggestion that [the defendant] was not familiar with drug trafficking" and "could have allowed a jury to infer knowledge"); *United States v. Contreras*, 602 F.2d 1237, 1240 (5th Cir. 1979)[5] (evidence of the defendant's prior cocaine use "demonstrated [his] familiarity with illicit drugs and was therefore relevant on the question of knowledge").

---

[5] Decisions of the former Fifth Circuit issued on or before September 30, 1981, are binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Therefore, the district court did not abuse its discretion in admitting the November 2020 text message exchange between Gonzalez and Tuckan.

### ii. Memes found on Gonzalez's cell phone.

Gonzalez also contends that the district court abused its discretion in admitting memes that he sent or received from his cell phone. The challenged images depicted or referenced cocaine (except for one that referenced marijuana), most often intending to be humorous. The images were found in Gonzalez's conversations with La Mula, Rojas, and Tuckan, not Corona or Neto. The images were sent or received by Gonzalez as far back as March 2019 (well before the timeframe of the charged conspiracy), and the most recent one was sent or received in January 2021, days before the traffic stop. The district court ruled that these images were not inadmissible character evidence, but rather were part of the res gestae of the case because they were inextricably intertwined with the charged offenses.

Evidence is admissible as res gestae when "it is (1) part of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense." *United States v. Nerey*, 877 F.3d 956, 974 (11th Cir. 2017). Here, most of the challenged memes were sent or received months or years before the charged offenses and none were directly tied to the charged offenses or inextricably intertwined with evidence of

the charged offenses. Thus, the district court erred in admitting the memes as res gestae.

However, under the circumstances, we find that the admission of the memes was harmless.

"[E]rroneous admission of evidence does not warrant reversal if the … error had no substantial influence on the outcome and sufficient evidence uninfected by error supports the verdict." *United States v. Fortenberry*, 971 F.2d 717, 722 (11th Cir. 1992). We reverse "only if [the error] resulted 'in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict.'" *United States v. Guzman*, 167 F.3d 1350, 1353 (11th Cir. 1999) (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)).

We have previously held that a district court's erroneous admission of evidence was harmless when the evidence's lack of probative value diminished the potential for undue prejudice. *See United States v. Sanders*, 668 F.3d 1298, 1315 (11th Cir. 2012) ("[T]he paucity of probative value creates an additional problem for Sanders—the remoteness and dissimilarity of the prior conviction not only decreases the probative value to show intent but also diminishes the potential for unfair prejudice."). Here, the memes had limited probative value, given their remoteness to the charged offenses and the fact that Gonzalez had no part in creating them and merely shared images that were readily available online. Indeed, Gonzalez's counsel emphasized these shortcomings by

vigorously challenging the significance of the memes on cross-examination and during closing argument.

We have also held that the erroneous admission of evidence was harmless when it was mentioned to the jury only in passing and it described actions that were "trivial" in comparison to the other conduct in the case, see United States v. Lehder-Rivas, 955 F.2d 1510, 1518 (11th Cir. 1992), and when substantial or overwhelming evidence of guilt remained even disregarding the erroneous evidence, see United States v. Phaknikone, 605 F.3d 1099, 1109–11 (11th Cir. 2010); United States v. Chavez, 204 F.3d 1305, 1317 (11th Cir. 2000).

Here, the Government did not emphasize the memes over the other evidence in this case:  discussion of the memes on direct examination totals only a few pages of the trial transcript, and the Government mentioned the memes only briefly in its closing argument.[6]  Moreover, sharing memes is a ubiquitous activity in today's world and Gonzalez's sharing of drug-related memes is trivial when compared to the conduct charged in the case—trafficking a significant quantity of cocaine from Houston to Atlanta—and the

---

[6] In fact, in rebuttal, the Government explained to the jury that "[Gonzalez] is not in that chair because he sent memes from his phone," reiterated Gonzalez's First Amendment right to send such memes, and again clarified to the jury that the memes were introduced simply as evidence of his knowledge and intent.

substantial other evidence of Gonzalez's consciousness of guilt that is summarized below.

At bottom, there was substantial evidence unrelated to the memes from which a reasonable jury could find Gonzalez's knowledge or consciousness of guilt. Indeed, as the district court pointed out, the jury very well could have convicted Gonzalez based on Kolbe's testimony alone. Therefore, any error committed by the district court in admitting the memes from Gonzalez's cell phone was harmless.

We did not overlook Gonzalez's suggestion that the district court's failure to give a Rule 404(b) limiting instruction concerning the cell phone evidence was reversible error. However, putting aside the fact that Gonzalez did not develop this argument in his initial brief and only mentioned it in passing in his reply brief,[7] we have held that refusal to give a requested Rule 404(b) limiting instruction warrants reversal only when: "(1) the requested instruction correctly stated the law; (2) the actual charge to the jury did not substantially cover the proposed instruction; and (3) the failure to give the instruction substantially impaired the defendant's ability to present an effective defense." *United States v. Fulford*, 267 F.3d 1241, 1245 (11th Cir. 2001). Here, Gonzalez was not precluded

---

[7] *See United States v. Woods*, 684 F.3d 1045, 1064 n.23 (11th Cir. 2012) (explaining that a party abandons an issue "by failing to develop any argument on it in his opening brief"); *United States v. Coy*, 19 F.3d 629, 632 n.7 (11th Cir. 1994) ("Arguments raised for the first time in a reply brief are not properly before a reviewing court.").

from presenting an effective defense because, as discussed above, his counsel attacked the significance of the memes on cross-examination and in closing arguments, and the Government even conceded in its own closing and in rebuttal that the memes were introduced simply as evidence of Gonzalez's knowledge and intent.

⋆    ⋆    ⋆

For these reasons, we conclude that any error in admitting evidence from Gonzalez's phone is not a basis for reversal of his conviction.

## B. *Joint possession jury instruction*

Gonzalez challenges the district court's instruction to the jury on joint possession. He conceded (in his brief and at oral argument) that he must show plain error because he did not object to the instruction before the jury retired to deliberate. *See Merrill*, 513 F.3d at 1305.

Under the plain error standard, a defendant must show "an error that is plain; that affects substantial rights; and that 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Holt*, 777 F.3d 1234, 1261 (11th Cir. 2015) (quoting *United States v. Madden*, 733 F.3d 1314, 1322 (11th Cir. 2013)). An error is plain when it is clear and obvious under current law. *Madden*, 733 F.3d at 1322 (quoting *United States v. Dortch*, 696 F.3d 1104, 1112 (11th Cir. 2012)). An error affects substantial rights when it is "prejudicial" (i.e., when it "affect[s] the outcome of the … proceedings"). *Id.* at 1323 (quoting *United States*

*v. Olano*, 507 U.S. 725, 734 (1993)).  Whether an error affects the fairness, integrity, or public reputation of judicial proceedings is "a case-specific and fact-intensive inquiry," which is met when, for example, the error risks unnecessary deprivation of liberty.  *See Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1908–09 (2018) (internal quotation marks omitted).

Here, immediately following the pattern instruction for joint possession, the district court told the jury:  "So if my wife and I are driving in my car, we both are in joint possession of the car."  Gonzalez contends that this "impromptu example" "improperly focused the jury's attention on possession of the truck, rather than the drugs, which is contrary to the law of this circuit."  According to Gonzalez, the district court's instructions "misle[d] the jury to believe if it found [Gonzalez] was in possession of the truck, then he also possessed the drugs hidden in the truck."

In *United States v. Cochran*, relied on by Gonzalez, we expressed our disapproval of a constructive possession jury instruction "stat[ing] that control over the *premises*—rather than control over the contraband itself—is sufficient to convict."  683 F.3d 1314, 1320 (11th Cir. 2012) (emphasis in original).  In addition to the pattern language, the challenged instruction in *Cochran* stated that "[c]onstructive possession of a thing also occurs if a person exercises ownership, dominion, <u>or control over a thing or premises concealing the thing</u>."  *Id.* (emphasis added).

However, when applying the plain error standard to a challenged jury instruction, we have held that

we do not consider the asserted errors in isolation. Instead we consider the totality of the charge as a whole and determine whether the potential harm caused by the jury charge has been neutralized by the other instructions given at the trial such that reasonable jurors would not have been misled by the error. … If another instruction the court gave neutralized the error, then it was not an error at all, let alone a reversible plain error.

*United States v. Iriele*, 977 F.3d 1155, 1178 & n.12 (11th Cir. 2020) (cleaned up). The panel in *Cochran* reached that same conclusion, holding that despite the erroneous instruction, when the instructions were read as a whole, they laid out the proper elements of the offense, and thus, there was no doubt that the jury was properly guided. *See* 683 F.3d at 1320–21.

Here, the district court gave the challenged instruction as part of a series of examples illustrating different types of possession with reference to a car and car keys. However, the district court also instructed the jury that the Government had to "prove[] beyond a reasonable doubt… that the defendant knowingly possessed cocaine"; that he "was a willful participant and not merely a knowing spectator"; and that he "actually knew about the controlled substance or had every reason to know but deliberately closed [his] eyes."

As in *Cochran*, we find that the instructions in this case, when read as a whole, laid out the correct elements of the offense

and properly instructed the jury on the issues of possession and knowledge.  Thus, even if the district court's joint possession car example was imperfect and ill-advised,[8] it was clarified and neutralized by the correct instructions, which provided the jurors with the requisite elements of the crime, including possession of cocaine and knowledge (or deliberate avoidance) of the fact that he possessed cocaine, which ensured that a finding that Gonzalez possessed the truck would not itself result in a conviction.  *See Iriele*, 977 F.3d at 1182; *United States v. Whyte*, 928 F.3d 1317, 1332–33 (11th Cir. 2019); *Cochran*, 683 F.3d at 1320–21.  Accordingly, the district court did not commit plain error when instructing the jury on the issue of joint possession.

## C. Sufficiency of the evidence

Gonzalez contends that the evidence was insufficient to sustain his conviction.  We disagree.

When reviewing for sufficiency of evidence, we must "view the evidence in the light most favorable to the verdict and draw all reasonable inferences and make all credibility choices in favor of the verdict."  *United States v. Howard*, 28 F.4th 180, 187 (11th Cir. 2022).  "A guilty verdict cannot be overturned if any reasonable

---

[8] Although we understand that that the district court was attempting to provide clarification of the somewhat esoteric concept of possession, it would have been better practice for the district court to stick to the jury instructions agreed to by the parties and avoid impromptu hypotheticals that might create an issue for appeal that would otherwise not exist.

construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." *Iriele*, 977 F.3d at 1168 (cleaned up). Moreover, "because a jury can freely choose among reasonable constructions of the evidence, 'it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt.'" *Howard*, 28 F.4th at 188 (quoting *Iriele*, 977 F.3d at 1168). We must view the evidence in its totality, not each piece in isolation. *See United States v. Prince*, 883 F.2d 953, 958 (11th Cir. 1989); *United States v. Meester*, 762 F.2d 867, 881 (11th Cir. 1985). Moreover, the test is the same regardless of whether the evidence is direct or circumstantial, and neither category of evidence receives special weight. *United States v. Isnadin*, 742 F.3d 1278, 1303 (11th Cir. 2014).

To convict Gonzalez for possession with intent to distribute cocaine, the Government had to prove "knowing possession" of and "an intent to distribute" the cocaine. *United States v. Cruickshank*, 837 F.3d 1182, 1189 (11th Cir. 2016). "[A] defendant may constructively possess a controlled substance if he exercises some measure of control over the contraband, either exclusively or in association with others" and "[t]he defendant's intent to distribute may be inferred from a variety of factors, including whether the government seized a large quantity of controlled substances." *Id.* In situations where drugs are hidden in a vehicle, this Court has required that "in addition to mere presence in the vehicle, or control over it, there be circumstances evidencing a consciousness of

guilt on the part of the defendant." *United States v. Stanley*, 24 F.3d 1314, 1320 (11th Cir. 1994) (quoting *United States v. Gonzalez-Lira*, 936 F.2d 184, 192 (5th Cir. 1991)).

Gonzalez argues that there is not sufficient evidence to sustain the jury's guilty verdict because there is no direct evidence of his knowledge of the cocaine in the truck and that the circumstantial evidence of his consciousness of guilt is insufficient. The Government responds that the jury reasonably found that Gonzalez knowingly possessed the cocaine in the truck's storage box. We agree with the Government.

The evidence presented at trial shows that Gonzalez drove a type of truck that was not typically used on long-haul interstate routes for hours across multiple states along a common drug trafficking route; that Gonzalez engaged in suspicious driving after passing a law enforcement officer; that Gonzalez appeared unusually nervous during the traffic stop, even after being assured he would not receive a ticket; that, unlike the experienced truck driver that he claimed to be, Gonzalez performed an unorthodox and perfunctory "safety inspection" of the truck, including noticeably focusing on, but not opening, the cargo box that would typically contain safety equipment and that turned out to contain a duffel bag full of cocaine; that the engine parts Gonzalez was hauling was likely a "cover load" because they would cost more to transport cross-country for repair than it would cost to buy new ones; that Gonzalez had limited knowledge of what he was hauling, produced irregular documentation for the load (including an incorrect bill of

lading which listed a produce stand as the destination), and lacked proper paperwork for the truck; that Gonzalez did not recognize the names on most of the paperwork he presented, knew little to nothing about Pure Power Logistics (the company named on the side of the truck), and lacked knowledge of other features of his trip; that Gonzalez made inconsistent statements, including a shifting account of Corona's role; that Gonzalez and Corona both claimed that they lacked a key to open the storage box where the cocaine was found; that Gonzalez tried to distance himself from the search of the truck by going to relieve himself in the trees when the officers began attempting to open the storage box; that Gonzalez was not surprised when the cocaine was found and he was arrested; that the storage box contained sixteen bricks of cocaine, each worth approximately $37,000 wholesale and up to $400,000 on the street once diluted; that drug traffickers do not typically use non-commercial-package-carrier blind mules, nor do they entrust such large high-value quantities of drugs to someone unaffiliated and unknowing, because that would risk losing valuable drugs; that Gonzalez's phone contained communications about drugs interspersed with communications about trucking and his trucking business, and some of the people with whom Gonzalez communicated were located in a known cocaine trafficking hub in Mexico; that Gonzalez expressed knowledge of the wholesale value of cocaine; and that Neto, Gonzalez and Corona's mutual connection, traveled to Matamoros to pick up items associated with Gonzalez's trucking business on the same day that Corona sent Neto photographs of bulk cash.

This evidence, construed in the light most favorable to the jury's verdict, is more than sufficient to meet each of the elements of possession with intent to distribute cocaine, including Gonzalez's knowing possession and consciousness of guilt. Indeed, we have found similar evidence sufficient to uphold a conviction under analogous circumstances. *See, e.g.*, *United States v. Almanzar*, 634 F.3d 1214, 1222–23 (11th Cir. 2011) (evidence was sufficient to find knowledge via "consciousness of guilt" when defendant was openly unnerved during the traffic stop, provided an implausible story about retrieving the truck from a boyfriend whose address she did not know, lied about who gave her the truck, provided phony proof of ownership, and was in control of the trip and dominated the conversation with the officer); *United States v. Leonard*, 138 F.3d 906, 909 (11th Cir. 1998) (government brought sufficient evidence to meet the "consciousness of guilt" prong with evidence of inconsistent stories and lack of surprise when the drugs were found in the car); *United States v. Quilca-Carpio*, 118 F.3d 719, 721–22 (11th Cir. 1997) ("[A] reasonable jury could conclude beyond a reasonable doubt that a person who is caught with luggage containing a significant amount of drugs [in a hidden compartment] knew of the presence of the drugs [and] could infer from the quantity of drugs seized that a 'prudent smuggler' is not likely to entrust such valuable cargo to an innocent person without that person's knowledge."); *United States v. Bustos-Guzman*, 685 F.2d 1278, 1280–81 (11th Cir. 1982) (defendants had been onboard what was ostensibly a fishing vessel for days, but the boat "contained no ice, tackle, refrigeration equipment, nets, or bait," the paperwork and

license for the boat did not match up, and marijuana was found locked up below deck).

In sum, because the evidence was sufficient to sustain Gonzalez's conviction, the district court correctly denied Gonzalez's motions for judgment of acquittal.

### D. Cumulative error

Gonzalez argues that the cumulative effect of the errors he alleges deprived him of a fair trial. However, having found only one harmless error in admitting the memes on Gonzalez's phone, we find no cumulative error. *See United States v. Walden*, 363 F.3d 1103, 1110 (11th Cir. 2004) ("[B]ecause no individual errors underlying the district court's [challenging ruling] have been demonstrated, no cumulative error can exist."); *United States v. Allen*, 269 F.3d 842, 847 (7th Cir. 2001) ("If there are no errors or a single error, there can be no cumulative error.") (cited in *Walden*).

## IV. CONCLUSION

For the above reasons, we affirm Gonzalez's conviction for possession with intent to distribute cocaine.

**AFFIRMED.**